Good morning, Your Honors. May it please the Court, Kirk Passage for Appellant Selgan Containers, LLC. We're here in a somewhat unusual circumstance in that there wasn't an underlying lawsuit filed, but there was mitigative action taken immediately by Selgan once Del Monte pointed out that there was a problem with the tomatoes in the Selgan containers. The real question that I think the Court focused on below was, was there property damage, and did we show it in enough of the cans of tomatoes? And I would submit that that's not the burden that Selgan bore below, and it's not the burden Selgan bears today. We do know that all of the tomato cans were going to fail, and if you believe the Director of Safety for Del Monte, whose testimony is in the record, their inventory, all of the cans had swelled. Now, that process may not have happened the instance that the sealant, the lining inside, failed, but we do know that it flaked, and we do know that the tomatoes became black or pink. They smelled. They had a metallic taste. Ultimately, the cans swelled, and ultimately, some of the cans exploded. Question for you, counsel. I gather that in addition to the normal insurance concepts we're dealing with here, you're saying that the action that you took was in part a mitigation of damages because the storage and other requirements to keep the cans until they all blossomed would have increased damages. Is that correct? That's part of it, Your Honor. I think it's a little more complicated than that. California law certainly has recognized for nearly 50 years now, going back to Getty's, that you can mitigate, and if you take a look at AIU or you take a look at Allstate, you can mitigate before actual property damage has happened if there's a reasonable connection between the likelihood of damage, eminence, if you will, and the steps you're taking. Well, since you're claiming that all of the tomatoes were essentially injured, I don't see how the destruction of the cans mitigated anything. Maybe you could clarify that. Well, I don't know necessarily that the destruction of the cans mitigated anything, but the reality is that when Del Monte made the decision with the 2006 PAC to cut it off, when Del Monte reported that all of the cans in his inventory were swollen, which was their statement, not Sogin's statement, the options, if you believe, the position that the insurer takes here are let it go out to the market, find a secondary market where apparently folks think black and smelly metallic tomatoes are edible, where there's flaking inside of those tomatoes. That doesn't make any sense. The mitigation effort here was to say not to go ahead and do that, not to take these things out. So I don't know if that was the market. That's the mitigation. Let me ask you, just turning to the language of the insurance contract for a moment, opposing counsel, their briefs, points to the language as physical injury to tangible property. And so the Court was focused on the tomatoes which were actually injured, I guess, within the policy period. And there's a second prong, loss of use of tangible property, but opposing counsel says that's ruled out by the impaired property exclusion, correct? Those are the arguments they've made, yes. Okay. So let me ask you about the impaired property exclusion. When I looked at that, they had language that defined not only excluding not only property damage to impaired property, but also to property that has not been physically injured arising out of a defect in your work. So why doesn't that part of the exclusion, property that has not been physically injured, so any tomatoes have not been physically injured due to a, but there's loss of use arising out of a defect in your work. I mean, that seems to completely address the problem, at least with respect to the damage that was caused by the tomatoes that were not physically injured. So why is it that the tomatoes that were not physically injured were not injured? I think it starts, Your Honor, where we see it a bit differently, is we think these tomatoes were injured from day one. Okay. So you have the incorporation doctrine, but assume for the moment that we don't agree with that, and we can get back to that, because I think that's an important point. If we don't agree with that, and they're not injured until they're actually, there's tangible injury to physical property as the contract defines it, doesn't the impaired property exclusion eliminate coverage for the undamaged tomatoes, or why doesn't it? I think there's two pieces to that question, Your Honor. If, in fact, the property isn't damaged, then I think that's a very fair question to ask us. And my response to that would be it's reasonable mitigation. When there's a certainty of damage that will occur, we don't have an obligation. In fact, the wise thing would be to not take that product to market. But the exclusion doesn't make any allowances for mitigation. The exclusion just states we don't cover this. So why doesn't that apply? It doesn't apply, Your Honor, because I agree with you. If you read the exclusion as you're suggesting and taking the facts that you're assuming, where we don't have damage to some of the tomatoes and those cans are not damaged, they're not covered per se, but they're pulled back because we are mitigating. If we didn't pull them back, they would go out there, they would swell, some of them would explode, there would be no doubt there would be damage. Now, the question that the trial court really didn't deal with was when is there some damage, and it made an assumption that there's no damage until later in time. I just want to pursue that, because my understanding is that the trial court really didn't deal with the exclusion issue. Is that correct? The trial court didn't deal with it at all. It tabled it as basically moot. So that record hasn't been developed. There's been no discussion. So if the court were to agree with you with respect to the meaning of the or the ambiguity of the physical injury and loss of use concepts, the proper result would be for us to remand this to the district court so that it could consider the facts and apply them to the exclusionary aspects of the policy. Is that correct? That is certainly our fundamental point, is these issues weren't addressed. If this Court's inclined to address them, then in response to the other point, I would note that in Armstrong, Armstrong I think is actually helpful for what the Court is considering here, not just because of the incorporation doctrine. In Armstrong, you had asbestos that was put in materials. There wasn't evidence that that asbestos was friable or deteriorating at the moment that it was placed in there, but rather there was a process that went on over time. And the Court addressed it as it did in Montrose Chemical Corporation. Well, can you, how about with Shade? Shade is the wood chips in the, in the clusters. You know, I was trying to, Shade seems closer to this case than, than Armstrong. I mean, Armstrong was at a time when people were hysterical about asbestos containing materials, and it seems to have been sort of shunted to the side by other California cases. But Shade, you have an edible product with, with wood chips in it which aren't immediately, I guess they won't, they won't kill you. They might hurt your teeth. But, but the, the problem I had with Shade was once the clusters with the wood chips went into the cereal, that box of cereal was unusable is what the Court said. Here, once the tomatoes went into the cans, the tomatoes weren't unusable until this process had taken place. So the incorporation doctrine seems to fit a little bit better in the Shade context than here because of the time lag between putting the tomatoes in and then the, the process. Explain to me why this deterioration of the film over time, we should still apply the incorporation doctrine, which seems a little bit of a question mark in, in California jurisprudence now. Well, Your Honor, I understand the, and I think hysteria was a good word. Having spent three and a half years trying the Armstrong case, we weren't hysterical by the end of it other than to get out of it. But I will tell you that when you take a look at that case, what the evidence in that record showed was there was no immediate danger from asbestos. It was a product that functioned like it was supposed to function until it, until it deteriorated at the surrounding material, deteriorated. Here, there's no evidence before the court below in the record, or here, that there was some delay between when the tomatoes hit the can and when things happen. The evidence in the record suggests that the acid content from tomatoes immediately started because the sealant, the inside film, didn't do what it was supposed to do, which is separate the tomato from the metal of the can. Now, that's a process that would have started immediately. Whether it's progressive or not, doesn't mean that there's no physical injury in the sense of something being somewhere it didn't belong. We had flakes that were somewhere that they didn't belong in the tomato. That's the kind of thing that Armstrong recognized. It's certainly what AIU recognized, that you can have property damage when it's microscopic or when there's contamination. I mean, the bedrock principle in Armstrong is you don't have to be able to detect it before there's injury or damage. That was the big argument. So the district court said you didn't present enough for any evidence of contamination of the tomatoes, that you needed to quantify the damage to the tomatoes. Now, what you're saying is there was a genuine issue or a genuine dispute of fact as to the contamination of the tomatoes. What evidence was put on? Was the district court wrong about that? The district courts, I don't think the district court focused on that point. The district court certainly said that Sobin didn't show how much of the tomatoes were affected or what percentage ultimately of the cans. There was the sampling. There was a big argument about whether it was statistically significant. But there were projections, obviously, of a failure rate from 12 percent to 75 percent as opposed to the norm of .01 percent. So there's no doubt that there was evidence. The battle over whether the conflicting expert reports, and the district court properly did not consider the insurer's expert report. So the evidence would be that there was a percentage projection you could talk about, and there was also evidence in the record that over time everything would have failed. Now, I thought you said that there was no evidence that there was a delay factor. I mean, I thought you did like a market basket test and 47 were affected and the rest were not, so that there was evidence in the record that it was they weren't affected or injured immediately. Well, the evidence would be that when the tomatoes were put in the can, because the sealant didn't do its job, the acid connected with the metal immediately. So we know two things happened immediately. Number one is the flaking from the lime, lime inside the can. That would have been immediate and may have increased over time. Don't know that. The second thing that would have happened is at some point, relatively immediately, the tomato would have hit the metal, and it's the acid reaction that would have been the problem. Now, what the record was talking about in terms of timing was how long before you see things like swollen cans. I don't know the precise estimate of that. We do know the record was that shelf life was substantially reduced, and we do know that Del Monte reported that the stock in inventory that it had left of the 2006 pack was quite swollen. So we know that's an advanced stage of the process because it would have to go through everything where you get the foaming, et cetera, et cetera. So when Del Monte says that all of its inventory from the 2006 pack was swollen, then we know that that process is close to completion. Now, they all hadn't blown up, so they hadn't gotten that far, but I would submit for property damage, you have property damage once those flakes hit the tomato. That's contamination. I think most people would say if you were told that the inside of a can had flakes in your tomato, you would probably push it aside on your plate. And was that undisputed? I don't think there's any evidence in the record to dispute that there was flaking from the get-go. Now, the precise timing, but certainly when you're looking at a year worth of coverage, or if you take the point of view that there's three years worth of coverage here, I mean, Liberty Mutual obviously felt that there was a single occurrence. They paid their limit. That was a position that Selgin accepted, obviously, because we believe there was a single occurrence. Its progressive nature that it may have continued beyond that period doesn't affect the fact that there was an occurrence within that policy period. So we believe there was property damage, but even if there wasn't, if we assume for a moment that there were no damage whatsoever, then our position would be that we took reasonable mitigative efforts to present to prevent any further damage to reduce what the insurance company would be obligated to pay. I've got two minutes left. Kennedy, we want to save that time. That's not a burden. Roberts, you don't mind if I squeeze in one question, do you? I do not. The district court decided primarily on the basis of the failure to quantify the exact amount of damage, and in response to that, counsel on both sides only talked about the Semtec case, an unpublished district court case. I take it by now the research is better, at least ours has been, that the Semtec case was relying upon an intermediate California appellate court case, which the Supreme Court has now indicated is inappropriate. That research wasn't before the Court. That wasn't provided by counsel, was it? It was not provided below, Your Honor, no. And was it available at that time? Your Honor, I don't know if it was available at that time. We were not counsel, and I don't know what was looked at then. I mean, I own this because I'm here today, but I can't answer that question. I don't know what was considered. So the district court was flying blind as far as the California law is concerned. Now that we know what California v. Armstrong says, what's your position as to whether or not we need to remand for reconsideration under the law as it is, rather than what he guessed it was, with no citation of assistance from counsel? Your Honor, we believe we obviously didn't ask for reversal as such. We asked for remand because we believe that is appropriate. We believe there are a number of issues between all State, between the questions on evidence and quantification, the expert evidence. We believe remand is the appropriate remedy so the district court can fully consider both the law as it is today and the facts. And actually was a ---- Okay. Thank you. Very well. Thank you. We'll hear from counsel for the National Union. Good morning. Good morning. Aguela Repas on behalf of the National Union. I would like to start with the assertion that all the cans were swollen, all the cans contained damaged tomato product. That is absolutely not true. And, in fact, if it were true, then Silligan would not be forced to rely on the mitigation and incorporation doctrines, which say that, you know, sometimes in some circumstances there can be coverage for fear of future property damage. So ---- Before you get into that exotic area, could you just come back to the question I asked your opposing counsel? It's true, isn't it, that the district court opinion is based upon the failure to quantify the exact amount of damage, correct? Correct. And in that relationship, he was relying upon the Sentec case, which we know is wrong, is not California law. So what is your position when the district court is not advised to the correct law, and we now find what the correct law is, and do you think that's critical to the case? And, if so, do we have to reverse and remand? Well, in terms of quantifying, Silligan's inability or failure to quantify, that is still the case, and that hasn't been changed by ---- I mean, you're referring to California v. Allstate. It hasn't been changed? That ---- that's a different issue. Sentec refers to Golden Eagle, relies on Golden Eagle, which has been vacated by the Supreme Court. The Supreme Court in that case was talking about a different type of quantification. So in this case, what we're dealing with is a more threshold issue. It's simply did Silligan or how much property damage did Silligan suffer. We know it's not 100 percent of the claim that they submitted to national union because we know for a fact that the defect did not affect all the cans. That's Silligan's own ---- Counsel, I'm a little puzzled by this. I grew up in the food business in the Northwest, and they used to can things. And if you had a lot or a group of cans and any of them had problems, you had to report it to the Department of Agriculture. And on the market, you were just dead. Is there any evidence in this case that that happened? No, absolutely not. In fact, we're talking about a population of 400 million cans. We're talking about 05 and 06 packs combined. The vast majority of that reached retail outlets before this defect was discovered. And we know that there's no safety issue because Del Monte did not recall any of that product. So if opposing counsel says, as soon as the tomatoes ---- I mean, there's the legal issue about incorporation, but he says as a factual matter, as soon as those tomatoes hit the can, changes, injury to the tomatoes happened. And he said there was evidence or there was no evidence rebutting that. And what's your position on that? I mean, Silligan's own witnesses testified that first ---- okay, first of all, it didn't affect every single can. So we're talking about a subset of the cans that were part of this claim. So in those cans that did ---- were affected by the defect, we didn't see there wasn't any manifestation of the problem until six to 11 months later when the cans began to undergo these hydrogen swells and discolor the product inside. So there was no ---- and, in fact, that's what the trial court found. There was no immediate impact on the tomato product inside. I mean, if they're relying on physical injury, that requires, you know, some kind of physical change to the tomato product inside. And that's not happening until months later, if at all. So ---- I'm sorry. Go ahead. I should say, we're in the record, would I find the information that you just gave us, that a good portion of the 2005, 2006 crop in these cans went out to the retail market and was sold. That's a very important point, obviously. Yes. So ---- Is it ER or SER? It's the ER, so ---- well, both, ER at 98, which, as I recall, I think it's a summary ---- Del Monte's summary of the claim and the problem. And the supplemental record excerpts at 114 and 219, and that's talking about 99 percent of the 05 pack made it to the market, 96 percent of the 06 pack made it to the market. And was it the same set of cans? Well, the withheld inventory was part of those packs, yes. Okay. And they all came from the same manufacturer of cans, is that correct? Silgan Manufacturing. Okay. Right. Okay. Yes, exactly. So we know that some of the tomatoes were damaged because they did this. We have in the record that at least 47 cans were damaged. They had some consumer complaints and the like. And so given that at least some were damaged, it seems like there was some coverage under the policy. Why wasn't the district court wrong in saying, well, just as a matter of law, there's no ---- there's no coverage at all? I mean, it seems like even if one can, the tomatoes in one can are damaged, then the insurance company would owe coverage, and so it has to go to trial. Why isn't that right? Because you have to remember the context in which this case is being decided. This is a duty to indemnify cases, not a duty to ---- Well, but I'm looking at the language of the contract. So tell me why under the insurance ---- insuring agreement, if Silgan's ---- if there is evidence of physical injury to tangible property, the tomatoes of Del Monte, and there was some evidence of it, if only in one can, why don't you owe Silgan coverage for that can? Well, if they could prove that one can or however many cans actually displayed discolored ---- Well, they've proved that at least 47 did, right? That's evidence in the record. No. That was a market sample. These were 150 cans taken from the market. Those cans aren't the subject of this claim. So there's no evidence in the record, you're saying, that any can that was the subject of the claim had a problem. Is that your ---- No. There's no evidence in the record? No. We know that some cans displayed discolored ---- Okay. Well, if there's some cans, why doesn't the insurance company owe Silgan coverage for that? They would owe coverage for that number of cans. Fine. But then we get past summary judgment, right? No, absolutely not. Because ---- Why is that? Because Silgan's position below was that they went for broke. They said, it's all covered, we're not going to quantify, we don't want anything less. So they didn't submit any evidence. So the problem is ---- I thought you just said there was some evidence in the record of some damage. Sorry. They didn't submit evidence quantifying the exact number of cans or that portion of the claim. In what case under California law says that the plaintiff has an obligation to quantify at summary judgment, have an exact quantification at summary judgment? I didn't find a case. They don't have to have an exact quantification, but they have to at least raise a fact issue if they want to get something less than 100 percent of their claim. If they want to recover at least a portion of their claim, they've got to submit some evidence to show that they quantify. Would you get back to her question, please? What case? What case? Well, I ---- Semtec, that's the case you argued. Is that the case that you're relying on? I'm sorry. I don't have a case right off the top of my head. But basically ---- Well, Semtec was what was in the briefs. I assume that's all they had before them. But we know that's wrong law. We know California v. Armstrong, versus Allstate, has indicated that that's wrong law. The district court was relying on a case that the Supreme Court has said was wrong. So why isn't that very important as to leading the district court astray with the wrong law? Because Allstate is not talking about the same kind of quantification we're talking about here. In Allstate, the insured had proved a claim within the basic scope of coverage. All the environmental damage, all the damages for which the insured was held liable, the State of California, was attributable to actual existing property damage, damage to the environment. The only question was, could the claim then be reduced due to covered and uncovered causes? I'm missing something. Are you saying it's still the California law that the plaintiff failed to quantify the exact amount is the issue? Is that what you're saying? That's correct. But we don't have a case on that, right? I didn't see a case holding that. It falls within the rule is that the insured has to prove. It's their initial burden to prove a claim within the basic scope of coverage. And they did, right, because they had evidence of damage to tomatoes, and that's all they needed to do. But no, no, not at the duty-to-indemnify stage. Well, it says that you will cover them for physical injury to tangible property, and there was physical injury to tangible property. And so they're entitled to coverage. The question is how much? Yeah. But that seems to be an issue of material fact that could be determined at trial. Why isn't that right? They submitted no evidence to show that they could get to trial. What are they going to do at trial? They threw the cans away. The evidence is gone. Oh, I have confidence that experts would testify as to what percentage of the cans were likely had injured tomatoes, and you could have your experts say, no, they're wrong, and then the jury could decide. I have no concern about that. But the point is, is they didn't submit it at trial because that wasn't their strategy. They've now changed it up on appeal. They waived the argument. They said, I'm going to do this. Wait a minute. The district judge said that they failed to quantify the exact amount, not any amount, exact amount. That was the basis upon which the law used, which we know is not the California law. Why don't we have to remand this for the district judge to look at the law of California now? But the law of California, I mean, all State hasn't – all State was decided in a different context. They're not talking about the same kind of quantification. Well, the important thing of that is that it overruled the court of appeals case upon which the district court in the unpublished disposition relied, and the district court relied on that unpublished disposition. Ginsburg-McCabe, I think what you're essentially saying is that you would be relieving Silgin of its obligation to prove the claim within the basic scope of coverage. We know for a fact – With the exact amount. We know for a fact, well, at least to raise sufficient evidence to create a fact issue. They wouldn't have to be held to it at trial, at the summary judgment stage, but they would have at least to raise a fact issue. It's exact. That's what the district court used. Failed to qualify the exact amount. Is that the rule? Is that the law? That would be their obligation at trial if they got that far. Exact amount to get the coverage. Yes, because – and this is why. Because we know they submitted a claim to us for all the cans that were discarded, and we know that not all the cans were affected. So that inventory included some cans that were perfectly fine. We don't cover that. There's nothing wrong with the cans. But as long as there was – I guess what puzzles me is as long as there was some evidence that their failure to be exact, which seems like a jury issue for trial, causes them to lose as a matter of law on the basis of saying that there's no coverage, that that really puzzles me. Because I don't find any rule under California law that failure to exactly quantify means you lose on summary judgment. I mean, even Semtex said as long as there's a genuine issue as to whether they could quantify, it goes to trial. Yeah. I mean, if they could submit evidence, which they didn't because that wasn't their strategy in the trial court, but we know Del Monte didn't count up the number of swollen cans. We know that Silgan didn't take any inventory of the swollen cans. The cans had been discarded. You know, they haven't proposed any alternate method of proving. Well, let me see if I understand this. Because there was no expert report or affidavit submitted by Silgan at the summary judgment stage as to how they would quantify the amount of tomatoes that were physically injured. Then the district court was correct to say there's no genuine issue about coverage even as to the tomatoes that are damaged. Is that – am I understanding your argument correctly? Well, correct. I mean, Silgan didn't submit any evidence that would even raise a fact issue on the ability to quantify, because that's not what they were asking. They were asking for 100 percent of the claim, which included cans that were perfectly fine. So they just didn't present the evidence. Now they've switched it up. They have new counsel on appeal. They've switched up their strategy. But the problem is, is they're stuck with the evidentiary void in the trial court. And that wasn't their strategy, and they can't fix it now. They haven't proposed how they're going to fix it. How did the district court word this, fail to quantify an exact amount? What was he looking for? Well, he would be looking for some – at least some methodology or some evidence to say, okay, it wasn't 100 percent of the cans, but it was something less, and this is how we can figure it out, because now the cans are gone. How are we going to do that? We know Silgan didn't take an inventory. Del Monte didn't take an inventory. So we don't know. So it's impossible to get to the exact amount. It is now. But is the exact amount required for coverage? For the duty to indemnify? Absolutely. It wouldn't be required on the duty to defend, because all you have to do is show some degree. You don't have to prove the exact amount. You get a defense. It's just potential at that stage. What's the case you rely on for that? Qualcomm, which says that the duty to defend is much broader than the duty to indemnify. Well, do you have a case where, because they couldn't – because the insured couldn't identify the exact amount of injury to a third person's property, they were therefore deprived of any coverage? Well, what's that case? You know, I don't – I don't have a case, you know, right off the top of my head. But that's basic insurance law principles, is that the insured has to quantify their damages. So they come in with an expert that says this is what we predict and this is a conservative amount that would be damaged within this period of time. Is there a case saying that wouldn't be good enough? You know, I don't know if that would be enough to raise a fact issue. But the point is, is that they submitted zero evidence on that below, and they've waived it. Thank you. And so with that, if there are no further questions, we ask them for a motion. Very good. Thank you, counsel. We appreciate the argument on both sides. The case just argued is submitted.
judges: Wallace, Smith, Ikuta